**UNITED STATES of America, ex rel. John FALLON, Robert Bradley, Jr., Pamela Carr, Kris Sheridan, Kelly Fallon and Atlantic States Legal Foundation, Relators/Plaintiffs,**

v.

**ACCUDYNE CORPORATION and Alliant Techsystems, Inc., Defendants.**

No. 93–C–801–S.

United States District Court, W.D. Wisconsin.

June 19, 1995.

Mark A. Cameli, Assistant U.S. Attorney, Madison, WI, for U.S.A.

Dennis M. Grzezinski, Milwaukee, WI, for John Fallon, Kris Sheridan, Kelly Fallon, Atlantic States Legal Foundation.

Sandra J. Strebel, Speigel & McDiarmid, Washington, DC, for Robert Bradley, Jr.

Bradley S. Weiss, Washington, DC, for Pamela Carr.

E. Grey Lewis, McDermott, Will & Emery, Washington, DC, for Accudyne Corporation.

Kevin C. Potter, Brennan, Steil, Basting &. MacDougall, S.C., Madison, WI, for Alliant Techsystems, Inc.

## MEMORANDUM and ORDER

SHABAZ, Chief Judge.

Relators John Fallon, Robert Bradley, Jr., Pamela Carr, Kris Sheridan, Kelly Fallon and Atlantic States Legal Foundation commenced this action on behalf of the United States pursuant to 31 U.S.C. § 3730(b) alleging that defendant Accudyne Corporation knowingly made false claims for contract payments in violation of 31 U.S.C. §§ 3729(a)(1), (2) and (3). Defendant Alliant Techsystems, Inc. acquired Accudyne in October, 1993. Relators' complaint asserts two independent claims based upon contracts between the United States and Accudyne for the production of military hardware. First, relators allege that Accudyne knowingly supplied data for nonconforming parts and failed to properly test completed products in performing a contract for the production of modular pack mine system (MOPMS) components. The second claim alleges that Accudyne knowingly failed to comply with environmental compliance provisions contained in government contracts and made false claims for payment by implicitly and explicitly representing that it had so complied. The United States exercised its prerogative pursuant to 31 U.S.C. § 3730(b)(2) to intervene and proceeded directly with the first cause of action but declined to exercise that option as to the second cause of action. Accordingly, relators continue to pursue the second claim on behalf of the United States pursuant to § 3730(b)(4)(B).

The matter is presently before the Court on six dispositive motions. The United States moves to dismiss defendants' counterclaims and affirmative defenses on jurisdictional grounds and alternatively seeks summary judgment based on an alleged lack of factual support. Relators bring a motion for partial summary judgment on their claim II seeking determinations as a matter of law that defendants were obligated to perform certain environmental actions and that they certified they had so performed. Finally, defendants advance three dispositive motions, challenging the constitutionality of the *qui tam* provision of the False Claims Act and seeking summary judgment on the merits of the claims of both the United States and relators.

## FACTS

The following is a summary of the relevant undisputed facts. Facts which are the subject of dispute are discussed in greater detail in the portions of this memorandum to which they are relevant.

Defendant Accudyne Corporation is a Wisconsin corporation in the business of manufacturing products for the United States Department of Defense. Two of Accudyne's manufacturing facilities are located in Janes-

ville, Wisconsin, adjacent to the Rock River. Accudyne is and has been party to numerous contracts with the United States Department of Defense for the manufacture of military equipment.

Relators John Fallon, Robert Bradley, Pamela Carr, and Kris Sheridan are all present or former maintenance employees of Accudyne Corporation. In addition to functioning as a maintenance supervisor Pamela Carr was also a supervisor in Accudyne's production area. Relator Kelly Fallon is the wife of John Fallon and was never employed by Accudyne. Relator Atlantic States Legal Foundation is an environmental not for profit foundation organized under the laws of the State of New York.

In early 1989 the United States Army transmitted a solicitation for a production contract for MOPMS components. Accudyne was the lowest bidder and accordingly entered into a contract with the United States on or about July 31, 1989 for $34,153,592.03 to manufacture MOPMS control and sensor electronic assemblies. The MOPMS contract awarded to Accudyne was a firm fixed price contract. Pursuant to the terms of the contract Accudyne was provided a technical data package (TDP) for the production of the electronic MOPMS assemblies. The TDP was produced by Hughes Aircraft Company as a product of a research and development contract for MOPMS in or about 1979. Hughes had previously been awarded a production contract for MOPMS control and sensor electronic assemblies on September 11, 1987 and had successfully completed production of such assemblies.

During the performance of the MOPMS contract by Accudyne numerous engineering change proposals (ECP) were required and additional material was supplied to supplement the TDP. Accudyne delivered electronic assemblies between June 30, 1992 and March 26, 1993 for which the United States paid Accudyne approximately $5,885,069. Both Hughes and defendant Alliant Techsystems, Inc. provided consulting services to Accudyne during the performance of the contract. On or about September 17, 1993 the MOPMS contract was terminated for convenience by the Army.

During the course of performing manufacturing processes for its government contracts Accudyne used and uses heavy metals, degreasers, lead nickel hydroxide, phosphoric acid, methylene chloride, trichloroethane, lead acetate, naptha, freon, alkalies, and various lacquers, solvents and thinners. In addition, Accudyne's manufacturing process produces some wastes that are considered hazardous under some definitions, including metal sledges and spent solvents. Contracts entered into by Accudyne with the Department of Defense contain various clauses relating to the handling and disposal of hazardous material and compliance with Clean Air Act and Clean Water Act Standards.

During the course of performance of its contracts Accudyne submitted periodic claims for payment to the United States providing invoices and certifications to the government in order to obtain payment. Forms 1433 and 1195, submitted periodically by Accudyne, contained the following certification:

I certify that the above statement (with attachment) has been prepared from the books and records from the above-named contractor in accordance with the contract and instructions hereon, and to the best of my knowledge and belief, that it is correct, that all the costs of contract performance (except herewith reported in writing) have been paid to the extent shown herein, or were not shown as paid have been paid or will be paid currently by the contractor, when due, in the ordinary course of business, that the work reflected above has been performed, that the quantities and amounts involved are consistent with requirements of the contract.

It is generally the practice of the United States to satisfy claims for payment within thirty days after the claim is submitted and approved.

## MEMORANDUM

There are presently pending before the Court motions to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, judgment on the pleadings pursuant to Rule 12(c) and for partial summary judgment pursuant to Rule 56.

Each of the four motions for partial summary judgment are governed by the same standard. Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure.

■ A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under Rule 56(e) it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

The Court now addresses each motion independently considering all motions relating to the MOPMS contract claim prior to consideration of motions relating to the environmental contamination claims, and considering jurisdictional issues prior to the merits of claims upon which motions are pending.

*Motions concerning the MOPMS claims.*

United States seeks dismissal of defendants' MOPMS counterclaims on jurisdictional grounds. Both the United States and defendants move for partial summary judgment on claims and counterclaims concerning the MOPMS contract.

**United States Motion To Dismiss Defendants' Counterclaims.**

The United States asserts this Court lacks subject matter jurisdiction over defendants' counterclaims for breach of contract and fraudulent inducement to enter into contracts. Specifically, it asserts that the Tucker Act, 28 U.S.C. § 1346, does not afford jurisdiction over contract claims in excess of $10,000 against the United States in this Court, nor does the Federal Torts Claim Act, 28 U.S.C. § 1346(b), provide jurisdiction over fraud or misrepresentation claims. Defendants respond that the Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over such claims or alternatively, that jurisdiction is appropriate at least to the extent that such claims are advanced for the limited purpose of set off or recoupment against the United States.

■ In order to assert jurisdiction over a claim or counterclaim against the United States, the United States must have unequivocally waived its sovereign immunity to suit. *Kuznitsky v. United States*, 17 F.3d 1029, 1031 (7th Cir.1994). Waiver of immunity may be of a general statutory nature, or in limited circumstances, may result from the commencement of an action by the United States. *Federal Sav. & Loan Ins. Corp. v. Quinn*, 419 F.2d 1014, 1017 (7th Cir.1969).

■ The United States has clearly not statutorily waived its immunity to defendants' counterclaims for breach of contract. This Court's statutory authority for hearing contract claims against the United States is found in the Tucker Act, 28 U.S.C. §§ 1491(a)(1) and 1346(a)(2). § 1491(a)(1) grants the court of federal claims exclusive jurisdiction for damages against the United States which exceed $10,000. Section 1346(a)(2) waives sovereign immunity for contract claims in this Court, but only to the extent such claims are for compensation not exceeding $10,000. *Pershing Div. of Donaldson, Lufkin & Jenrette Sec. Corp. v. United States*, 22 F.3d 741, 743 (7th Cir.1994). These limitations generally apply equally to claims and counterclaims. *See* Rule 13(d), Federal Rules of Civil Procedure.

■ Furthermore, this limited waiver of immunity cannot be altered as suggested by the defendants through application of supplemental jurisdiction provided by 28 U.S.C. § 1367. The Seventh Circuit has expressly rejected this argument:

The government cites several cases from other circuits which found that an express limitation embodied in the Tucker Act cannot be overcome by supplemental jurisdiction. And this court referred explicitly to the Tucker Act in holding that "[o]nly the claims court may award more than $10,000

against the United States on account of claims under the Constitution...." *Rose Acre Farms, Inc. v. Madigan,* 956 F.2d 670, 673 (7th Cir.1972). Section 1367 cannot override this exclusive jurisdiction.

*Id.* at 744 (Citations omitted). Accordingly, there is no independent statutory basis for taking jurisdiction or finding waiver of sovereign immunity over the breach of contract counterclaims designated as defendants' second counterclaim and sixth affirmative defense.

■ Neither does the waiver of sovereign immunity for tort actions found in the Federal Tort Claims Act, 28 U.S.C. § 1346(b), encompass the claims for fraud or misrepresentation found in defendants' first and third counterclaims. 28 U.S.C. § 2680 provides in relevant part:

> The provisions of this chapter and § 1346(b) of this title shall not apply to—
>
> .   .   .   .   .
>
> (h) any claim arising out of ... misrepresentation, deceit, or interference with contract rights ...

Clearly the United States has not statutorily waived its immunity to defendant's claims for fraud in the inducement.

■ Although the United States has not explicitly waived its sovereign immunity to defendants' counterclaims, both parties recognize that the commencement of an action by the United States is a limited waiver of sovereign immunity for counterclaims against the government if the counterclaim arises out of the same transaction or occurrence as the government claims and the relief neither exceeds nor differs in kind from that sought by the United States. *Quinn,* 419 F.2d at 1017; *United States v. Lindberg Corp.,* 882 F.2d 1158, 1163 (7th Cir.1989) (citing 6 C. Wright & A. Miller, Federal Practice and Procedure, § 1427 (1971 & Supp.1988)). The United States asserts that jurisdiction is unavailable under this limited exception for two reasons. First, the United States asserts that defendants' fraud in the inducement claims, particularly the claim by defendant Alliant that it was fraudulently induced to enter into a novation agreement, do not arise out of the same transaction or occurrence as the United States' claims. Second, it asserts that the counterclaims at issue cannot be construed as mere claims for recoupment but seek affirmative recovery against the United States which recovery is beyond the scope of the waiver of sovereign immunity.

Concerning the first argument, the Court finds that each of the three challenged counterclaims arise from the same transaction and occurrence and therefore fall within the scope of the recoupment doctrine. One of the fundamental factual issues in this matter is whether the TDP was so inadequate as to preclude defendants from properly performing their contract. Representations concerning the TDP are therefore directly related to the breach of contract claims and counterclaims. Concerning Alliant's claim for fraudulent inducement to enter the novation agreement, it is clear that this agreement is essential to the United States' claim for liability against Alliant. Certainly a challenge to the validity of a contract which forms the basis of liability must be deemed a part of the same transaction or occurrence as a claim for the enforcement of liability imposed by the contract.

Turning to the United States' second argument, the Court finds that the complaint can properly be construed as limited to a request for recoupment and the Court so construes it. Accordingly, the Court denies plaintiffs' motion to dismiss the defendants' sixth affirmative defense and first, second and third counterclaims except that such counterclaims are limited to the right to a set off against any recovery by the United States and may not be the basis for any affirmative judgment against the United States.

**United States Motion For Summary Judgment On Defendants' Affirmative Defenses And Counterclaims.**

The United States seeks summary judgment on defendants affirmative defenses and counterclaims relating to estoppel, fraud in the inducement and breach of contract.

■ Defendants third and fourth affirmative defenses are based upon the doctrine of equitable estoppel. In order to assert equitable estoppel against the United States a

party must establish the traditional elements of equitable estoppel:

(1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on that misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel.

*Kennedy v. United States* 965 F.2d 413, 417 (7th Cir.1992). In addition to these traditional elements defendants must also show affirmative misconduct on the part of the government. *Id.* It is this additional requirement upon which the United States relies most heavily to support its motion for summary judgment. Reviewing the facts of record the Court concludes that the United States is entitled to summary judgment on the third affirmative defense but that a material factual dispute exists which precludes summary judgment on the fourth affirmative defense.

■■ The essence of defendants' third affirmative defense is as follows:

Accudyne relied on the government's conduct in permitting Accudyne's performance under the contract, and was unaware of the performance which the government accepted would subsequently be deemed nonconforming to the extent of rendering Accudyne's certifications false or fraudulent.

The government therefore is estopped from asserting that Accudyne's claim with respect to the MOPMS contract were fraudulent.

Defendants' Answer to the United States Second Amended Complaint at 10. These allegations simply do not describe affirmative misconduct of the type which would permit an estoppel against the government. Clearly, encouraging Accudyne to perform its contract and accepting nonconforming goods cannot constitute affirmative misconduct. Indeed, it is doubtful that such facts could even establish the first traditional element of estoppel, a misrepresentation. Since the third affirmative defense does not allege any actions which could conceivably constitute affirmative misconduct by the government summary judgment is appropriately granted.

■■ Defendants' fourth affirmative defense relies upon alleged misrepresentations by the government concerning the adequacy of the TDP provided to Accudyne. There is substantial factual dispute concerning both the adequacy of the TDP and the representations by the government concerning it, but there are clearly sufficient facts supporting defendants' position that summary judgment cannot be granted in favor of the plaintiff. There is a direct clash of evidence concerning whether the TDP provided to the defendants was complete. In fact, the United States' own pre-award assessment makes the following recommendation:

The bidder has an approved functional Quality Program, as required. However, he does have some areas for which he lacks a complete understanding. This lack of understanding is generally dependent on the poor condition of the TDPL. It is felt the contractor will be capable of performing satisfactorily on this solicitation should the buying activity provide the needed clarification to the TDPL. It is recommended however that the buying activity not award this contract to any bidder until a clear, understandable TDPL can be established.

Meanwhile, the government suggests in its proposed findings of fact that plaintiff assured Accudyne personnel they possessed everything necessary for production.

The fact that Hughes was capable of successfully manufacturing MOPMS electronic assemblies does not establish as a matter of law that the TDP was adequate. Since Hughes was the contractor who performed the research and development contract and created the TDP it can reasonably be inferred that it had knowledge beyond the scope of the TDP which enabled it to successfully manufacture the components. Accordingly, the Court finds that there is a material factual dispute concerning whether the TDP was adequate and whether the plaintiff affirmatively represented its adequacy knowing that it was inadequate. If the government did affirmatively misrepresent the adequacy of the TDP such a misrepresentation could rise to the level of affirmative misconduct supporting an estoppel defense.

The same factual issue precludes the granting of the United States' motion for

summary judgment on the claim that Accudyne was fraudulently induced to enter into the MOPMS contract by the United States false representations of the adequacy of the TDP. Whether defendants' failure to successfully manufacture the MOPMS assemblies was due to an inadequate TDP or to their own inexperience and negligence in manufacturing the testing equipment is a vigorously contested issue of fact. The facts as presented on summary judgment permit the inference that the United States falsely represented the adequacy of the TDP and that the inadequacy was the cause of defendants failure to successfully manufacture the product. Accordingly, plaintiff's motion to dismiss defendants' seventh affirmative defense and first counterclaim must be denied.

Finally, the Court also concludes that material factual issues remain concerning whether the United States breached its contract with defendant. These claims once again hinge on the determination of the adequacy or inadequacy of the TDP and the related fact issue of the cause of the failure to successfully produce the MOPMS assemblies. In a contract such as the MOPMS contract the government warrants that its specifications are adequate and feasible to produce the product in the time and manner contemplated by the parties. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). *Edward E. Gillen Co. v. Lake Forest*, 3 F.3d 192, 198–99 (7th Cir. 1993). Viewing the evidence most favorably to the defendants it may be established that this warranty had been breached by the provision of an inadequate TDP which was not properly corrected and which would not feasibly permit completion of the product. Accordingly, plaintiff's motion to dismiss the breach of contract affirmative defense and counterclaim, affirmative defense 7 and counterclaim 2 is denied.

### Defendants' Motion For Partial Summary Judgment on United States Claims.

Defendants' motion identifies certain specific issues and allegations alleged by the United States in an apparent attempt to limit issues for trial. There is no suggestion that defendants are entitled to summary judgment in their favor on the United States' FCA claims. Accordingly, the Court examines their argument to determine how, if at all, the United States claims may appropriately be limited at trial.

The first issue addressed by defendants concerns the adequacy of the testing equipment and its operators. More specifically, defendants seek a determination on summary judgment that the testing equipment was adequate and that the operators were not inadequately trained. The Court finds that these two issues are so related and that the evidence of inadequate testing is so substantial that no determinations can be made as a matter of law on this issue. The testimony of Kent Eric Slater as well as documents from Accudyne's former president Womersley establish that the testing units were not properly calibrated for radio frequency. It is further undisputed that the test equipment operators would be in no position to determine whether the testing equipment was properly calibrated.

Defendants rely on the fact that the United States approved the testing devices at a prove up prior to manufacture as part of the contracting process and therefore had full knowledge about them. Furthermore, defendant asserts with support that the testing devices were intended to be so simple to operate that little training was necessary for the operators. Neither of these facts are sufficient to support summary judgment in defendants favor. While the United States may initially have approved one of the testing units that determination is far different from determining that they were at all times thereafter properly calibrated. Furthermore, while the units may have been intended to be so simple that they required little training, the minimal training provided to the operators may well have assured that an improperly functioning or miscalibrated testing unit would have gone undetected. Accordingly, numerous fact issues including whether the government or Accudyne were aware of the radio frequency miscalibration, whether such miscalibration led to the tender of defective units and whether the failure to train operators more extensively contributed to the misfunctioning of the testing units all

preclude the granting of summary judgment on that issue.

The second issue for which defendants seek summary judgment is the United States' allegation that defendants knowingly submitted MOPMS assemblies containing faulty parts. Having examined the testimony of Pamela Carr the Court concludes that there is sufficient testimony to preclude summary judgment on this issue. Carr testified that there was widespread knowledge that Accudyne knew of the problems existing on the production floor including unorganization and the inadvertent mixing of good and faulty parts. She further testified that her supervisor authorized the use of damaged parts which she believed would have a significant impact on the assembly and that parts were missing and swapped between lots, serial numbers being obliterated and replaced. All of this testimony tends to support an inference that the MOPMS assemblies contained faulty parts and that Accudyne was aware of this fact. Accordingly, summary judgment cannot be granted on that issue.

The final issue addressed by the defendants is the effect of the submission of DD–250 Forms wherein a government quality assurance representative certified the compliance of the MOPMS assemblies with the contract. Defendant is generally correct when it asserts that DD–250 Forms are not certifications of the contractor which can be a false statement. *United States v. Cannon*, 41 F.3d 1462, 1468 (11th Cir.1995). But while a DD–250 may not ordinarily, by itself, constitute a false statement or representation by the contractor, whether a request for payment constitutes a false claim against the government requires a review of the totality of the circumstances. To the extent that the statements supplied on the DD–250 together with other statements and documents and requests for payment had the intended effect of inducing the government to pay claims which were not properly payable they may clearly constitute a false claim within the meaning of § 3729(a)(1).

This is particularly so in the case of a contractual testing requirement since proper performance of such requirements is not generally apparent from the goods themselves. If a contractor knowingly fails to perform testing as required by a contract, and tenders the untested goods, making a claim for full payment, it has surely submitted a false claim. Under such circumstances a false claim may arise from not advising of a failure to perform a material part of the contract. This circumstance was aptly described by the court in *Ab–Tech Const. v. United States*, 31 Fed.Cl. 429, 433–34 (1994):

> The False Claims Act reaches beyond demands for money that fraudulently overstate an amount otherwise due; it extends "to all fraudulent attempts to cause the government to pay out sums of money." *United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1968).
>
> Seen from this broader prospective, Ab–Tech's claims clearly were fraudulent. The payment vouchers represented an implied certification by Ab–Tech of its continuing adherence to the requirements for participation in the 8(a) program. Therefore, by deliberately withholding from SBA knowledge of the prohibited contract arrangement with Pyramid, Ab–Tech not only dishonored the terms of its agreement with the agency but, more importantly, caused the government to pay out funds in the mistaken belief that it was furthering the aims of the 8(a) program. In short, the government was duped by Ab–Tech's active concealment of a fact vital to the integrity of the program. Withholding of such information—information critical to the decision to pay—is the essence of a false claim.

*See also Imperial Meat Co. v. United States*, 316 F.2d 435, 441 (10th Cir.1963). (False claim, as opposed to false statement, established by seeking full payment for delivery of goods known to be non-conforming.)

There can be little doubt that adequate performance testing was an even more critical element of the MOPMS contract than was compliance with program requirements in *Ab–Tech*. Since the facts currently in the record, viewed most favorably to the United States, support a finding that Accudyne submitted various documents and request for

payments while knowing that it had not performed tests in compliance with contractual requirements and had used faulty parts in production of the components, summary judgment cannot be granted in its favor on the government's claims.

## Motions Concerning Relators Claim II.

Defendants move to dismiss relators' claim II on the basis that the *qui tam* provision of the False Claims Act is unconstitutional as applied in these circumstances. Assuming the claim survives this constitutional challenge both parties move for partial summary judgment on various aspects of the claims. The Court begins with the constitutional analysis.

## Constitutional Challenge To The Qui Tam Provision Of The False Claims Act.

Notwithstanding that the False Claims Act has been in place since the Civil War it has come under recent attack on constitutional grounds based principally on the assertion that prosecution by private individuals of claims of the United States violates the doctrine of separation of powers embodied in various provisions of the Constitution. Neither the Seventh Circuit Court of Appeals nor the Supreme Court have expressly considered the constitutionality of the False Claims Act's *qui tam* provision. However, the Second, Sixth and Ninth Circuits have resounding rejected these constitutional challenges as have the numerous district courts which have considered the issue. *See United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148 (2nd Cir.1993); *United States ex rel. Taxpayers Against Fraud v. General Elect. Co.*, 41 F.3d 1032 (6th Cir.1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993). For the reasons set forth below the Court finds these prior decisions from other circuits, as well as the analysis of the Seventh Circuit on related statutes, to be persuasive and appropriate constitutional analyses.

■ Defendants' challenge the right of relators to commence this action on the basis that they lack standing since the actual controversy is between the United States and the defendants. More specifically, that the relators themselves have not suffered an injury in fact. *See Lujan v. Defenders Of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). This argument was recently answered by the Seventh Circuit Court of Appeals in *United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208 (1995). The Court reasoned, as have numerous other courts confronting the issue, that the real party in interest in a *qui tam* action is the United States which has assigned its right to sue to the relator.

> Once we accept the premise that the United States is the real plaintiff in a *qui tam* action, it stands to reason that challenges to the standing of the government's representative are beside the point. The United States, like a corporation, must act through its agents. When it acts in a prosecutorial fashion, it usually does so through attorneys within the Department of Justice, or one of its executive agencies.... That Congress should enlist a private party, instead of one of the government's more common representatives, to champion the government's case should not change this outcome. Nor, for that matter, should it be necessary for the private *qui tam* relator to demonstrate a "personal stake" in the outcome of the dispute any more than it would be necessary for an Assistant United States Attorney to prove that he has a personal stake in the outcome of the case ... Rather, for the purpose of establishing standing, it is enough that there "exist[s] ... a clearly defined adversarial relationship between the government and the defendant, not, between the defendant and the United States' particular legal representative."

*Id.* at 1213 (Citations omitted)

Since there is no issue as to the United States' standing to pursue the allegedly fraudulent conduct it is clear that under the Seventh Circuit analysis the relators have standing to pursue the matter.

In a practical sense it is equally clear that the adversarial circumstances which the case or controversy requirement attempts to assure are present. Since the relators are advancing their own funds in prosecution of this suit and are entitled to receive a share of

any recovery, there is a direct and adversarial controversy between relators and defendants. *See Boeing,* 9 F.3d at 749.

■ Recognizing that relators have standing to pursue this action by virtue of a Congressional assignment or designation to represent the United States' interest, concerns arise over whether this arrangement violates the separation of powers principles embodied in Article II of the Constitution. *See Hall,* 49 F.3d at 1216. More specifically, whether the *qui tam* arrangement is precluded by the Appointments Clause of Article II, § 2 or by the provision of Article II, § 3 commanding that the President "shall take care that the laws be faithfully executed." Because of the substantial control over a relators action vested in the United States it is clear that the authority of the Executive Branch to appoint officers and execute laws has not been improperly delegated through the *qui tam* provision. The two issues, though related, are best analyzed separately.

Concerning separation of powers and the duty of the Executive Branch to execute laws, the issue is whether the Executive Branch retains sufficient control over the action so that the President can be found to be performing his constitutionally assigned obligation. A review of the authority over FCA claims which remains in the hands of the executive branch reveals that no unconstitutional delegation has taken place:

> Under the FCA the Executive Branch can control a *qui tam* relators exercise of prosecutorial powers in several ways. The government can intervene in a case and then take primary responsibility for prosecuting the action; it can seek judicial limitation of the relators participation; it can move for dismissal of a case which it believes has no merit, after notice to the relator and opportunity for a hearing; it can seek a judicial stay of the relators discovery regardless of whether it intervenes; and it remains free to seek any alternate remedies available, including through any administrative proceeding.

*Boeing,* 9 F.3d at 753. These powers in the Executive Branch considered as a whole provide a sufficient degree of control that the proper balance of powers for the execution of laws is not disrupted. *Id.* at 757.

The challenge under the Appointments Clause is slightly different. The question is whether the authority delegated to relators is so substantial that they must be deemed "Officers of the United States" who must be appointed by the President. However the same considerations that lead to the conclusion that executive power has not been improperly usurped supports the determination that relators are not vested with sufficient authority to be deemed "officers of the United States".

> Although a relator may sue in the government's name, the relator is not vested with governmental power. Indeed, as noted above, the government may take complete control of the case if it wishes. Furthermore, the relators "position is without tenure, duration, continuing emolument, or continuous duties. *Auffmordt v. Hedden,* 137 U.S. 310, 327, 11 S.Ct. 103, 108, 34 L.Ed. 674 (1890)." Therefore the relator is not an "officer" within the meaning of the appointments clause.

*General Electric,* 41 F.3d at 1041. The Court concurs that relators are not so vested with authority that they constitute officers of the United States.

■ The final constitutional challenge advanced by the defendants is that the FCA *qui tam* provision violates the due process clause by permitting private citizens with an interest in the outcome of the proceedings to prosecute claims on behalf of the United States. Defendants rely upon *Young v. United States,* 481 U.S. 787, 801, 107 S.Ct. 2124, 2134–35, 95 L.Ed.2d 740 (1987), which held that private attorneys appointed to be criminal prosecutors must be personally disinterested. *Id.* at 804, 107 S.Ct. at 2136.

Reliance upon *Young* in this case is misplaced for two reasons. First, the majority did not suggest that the error in appointing a private attorney interested in the underlying litigation rose to the level of a due process violation. Second, *Young* related to a criminal prosecution and there is no basis to believe it could be extended to the enforcement of the civil provisions of the False Claims

Act. *See Id.* at 808, 107 S.Ct. at 2138. Finally, as noted by the Ninth Circuit in *Kelly:*

> The type of conflict of interest at issue in *Young* is simply not extent in the *qui tam* situation, where private and public goals are congruent.... [I]n the FCA context, Congress has created a scheme in which the interests of the private prosecutor (that is the relator) coincide with the public interest in remedying harm to the federal treasury. Under the explicit terms of the Act, a *qui tam* action is taken on behalf of *both* the government and the relator, indicating that the two share a single interest in successful litigation.

9 F.3d at 760. For all of these reasons it is clear that the *qui tam* provision authorizing pursuit by a relator of civil remedies on behalf of the United States is not in violation of the defendants' right to due process.

Having concluded that the *qui tam* provision of the FCA are constitutionally firm the Court now examines the merits of relators' claim.

**Defendants' Jurisdictional Challenges to Relator's Claim II.**

Defendants argue that this Court is deprived of jurisdiction over the *qui tam* action pursuant to 31 U.S.C. § 3730(e)(4)(A) because there has been prior public disclosure of the allegations of the complaint and relators do not qualify as original sources of those allegations. Addressing defendants' jurisdictional challenge the Court begins by examining the statutory limitation on its jurisdiction found at 31 U.S.C. § 3730(e)(4)(A):

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a Congressional, administrative, Government Accounting Office report, hearing, audit or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

"Original source" is statutorily defined to mean:

> An individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under this section which is based on the information.

Analysis under these sections is a two step process. First the Court determines whether the allegations or transactions which are the basis for the suit have been publicly disclosed within the meaning of § 3730(e)(4)(A). If the Court finds that the allegations have been publicly disclosed it then considers whether the relators constitute original sources of information within the meaning of the Act. *Houck ex rel. United States v. Folding Carton Admin. Committee,* 881 F.2d 494, 504–505 (7th Cir.1989). Because the Court concludes that insufficient public disclosure has taken place it need not reach the question of whether relators are original sources, though it is clear that at least some of them are.

■ There is substantial dispute between the parties as to whether relevant facts were "publicly disclosed" within the meaning of the statute. Certain facts clearly were publicly disclosed. There was public disclosure in the news media that Accudyne had entered into the contracts with the government which are the underlying basis for the FCA claims. It is also undisputed that the lead fluoroborate spill at Accudyne's North Franklin Street facility was the subject of a newspaper article, indicating that a spill had occurred but further reporting that none of the spill acid reached the Rock River.

There is substantial dispute between the parties as to whether certain notices of deficiencies and non-compliance sent to Accudyne by the Wisconsin Department of Natural Resources (DNR) and the City of Janesville, Wisconsin, constitute publicly disclosed information. Even more significantly, the parties dispute whether a Wisconsin Department of Natural Resource investigation which took place in 1993 after being instigated by complaints from relator John Fallon constitute the public disclosure of that information so as to preclude the subsequent FCA action based upon the same allegations.

The Court finds that neither the notices of non-compliance and deficiency nor the DNR investigation qualify as publicly disclosed information which would preclude the filing of *qui tam* action. There is no evidence that the non-compliance notices sent as a result of routine inspections were received, viewed or disclosed by or to anyone other than Accudyne. The mere creation of such a document by a state agency does not constitute public disclosure within the intended meaning of § 3730(e)(4)(A). Recent analysis by a court considering the issue provides insight:

> Analysis of the rationale governing these cases, and the purposes underlying the FCA, yields the following principle: aside from disclosures resulting from news media exposure, public disclosure occurs when the government has affirmatively provided to members of the general public access to information upon which the FCA claim is based.
>
> The lynchpin of this formulation of the public disclosure test is the requirement that the government perform some affirmative act of disclosure. The mere existence of a report, audit, or investigation containing information pertaining to fraud does not, in and of itself, constitute public disclosure.
>
> .    .    .    .    .
>
> Not requiring some positive act of disclosure would reinstate the pre–1986 jurisdictional bar based on mere "government knowledge" of information pertaining to fraud. Congress sought to replace this restrictive jurisdictional prerequisite in part because of its concern that the government was not pursuing known instances of fraud.... If the mere existence of a "no action" recommendation buried in an unreleased internal audit report has the affect of foreclosing *qui tam* actions, the 1986 amendments were for naught.

*United States ex rel. Fine v. MK–Ferguson Co.,* 861 F.Supp. 1544, 1550–51 (D.N.M.1994).

▪ The reasoning is even more compelling when a state government agency produces documents which are not publicly disclosed. Under these circumstances there is no reason to believe that the United States would become aware of such information.

Accordingly, the scope of the definition of public disclosure cannot extend to documents which, though theoretically accessible by a member of the public through an appropriate administrative request for documents, were never the subject of publication or notification by the agency. In an analogous situation, the D.C. Circuit held that documents, though theoretically available to the public, were not publicly disclosed.

*United States ex rel. Springfield Terminal Ry v. Quinn,* 14 F.3d 645, 653 (D.C.Cir.1994).

> If discovery materials are not filed with the Court, they are only potentially in the public eye. If they are not yet in the public eye, no rational purpose is served— and no "parasitism" deterred—by preventing a *qui tam* plaintiff from bringing suit based on their contents. To bar a *qui tam* suit under these circumstances would prevent the utilization for enforcement purposes of allegations or transactions that may not otherwise come to the attention of the authorities.

*Id.*

▪ While this analysis eliminates the notices of non-compliance it even more clearly eliminates the DNR investigation from the realm of publicly disclosed information. So far as can be discerned from the record the DNR investigation was not completed at the time the present action was filed. There is no evidence in the record to suggest that documents which would have disclosed the allegations of complaint were even created prior to the filing of this complaint. Furthermore, the DNR's conclusion was that the allegations were groundless. Accordingly, had the documents been published they would have disclosed the lack of any violations.

▪ Having determined what information was publicly disclosed, the Court must next consider whether that disclosure amounts to "allegations or transactions" upon which the action is based. Id. at 653. Clearly an action based solely upon information which was publicly disclosed is barred by the provision. *Folding Carton* 881 F.2d at 504. A more difficult question arises when some in-

formation relied upon by the plaintiff is undeniably in the public domain while other information is not in the public domain but is supplied by the qui tam plaintiff. *Springfield Terminal Ry,* 14 F.3d at 653. Under such circumstances the Court finds the formulation in *Springfield* to be the most reasonable interpretation of the statute:

> The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

*Id.* at 654.

In this case, providing a liberal view as to that which was available to the public, it is clear that such information would not supply the allegation of fraud or the elements necessary to such an allegation. The essential elements of the *qui tam* plaintiffs' claim are the existence of contract provisions requiring environmental compliance, the failure to comply with such contractual requirements and the submission of claims to the government in such a way that the government was induced to make payments believing that there had been compliance with the contractual provisions. The most that can be is said that publicly available information established that Accudyne entered into contracts with the government and subsequently committed acts which put it in non-compliance with environmental laws. Absent from the public disclosure are the provisions of the contracts requiring compliance with the environmental laws, most of the information contained in the complaint concerning violation of the contract provisions and any information concerning the representations or non-disclosure to the government in order to induce payment. Clearly, under these circumstances, even taking a generous view of that which was available to the public, such information did not disclose the allegations or transactions upon which this action is based.

Finally, regardless of whether the matter was publicly disclosed it is virtually irrefutable that at least some of the relators are original sources of information who would be permitted to commence the action pursuant to § 3730(e)(4)(B). The most significant alleged public disclosure is the investigation conducted by the Wisconsin DNR in 1993. This investigation, however, was instigated at the request and based upon information provided by a relator. It would be fundamentally contrary to the provisions of the statute to preclude such an individual from commencing an action based upon this information. Indeed, such a person is no doubt precisely contemplated by § 3730(e)(4)(B). Finally, there is every indication based upon the deposition of Hummel that relators disclosed their information to the government prior to filing of the action.

Accordingly, the Court concludes that relators are not precluded from bringing this claim based upon a lack of jurisdiction under § 3730(e).

**Motions Concerning Contract Provisions and Certification.**

■ Both relators and defendants advance motions seeking summary judgment on the scope of the contract provisions and the extent of Accudyne's certification or representation that it complied with the contract requirements. Examination of the relevant law and the facts before the Court on summary judgment leads the Court to conclude that neither party is entitled to judgment as a matter of law based on these issues.

Concerning the content of the contract provisions, they speak for themselves. The provisions in the contract entered into between Accudyne and the United States are largely a matter of undisputed fact. The relevant remaining issue is whether the actions or inactions of Accudyne violated the contract provisions. Since the actions or inactions of the defendants are the subject of dispute no meaningful legal analysis, only advisory speculation, is possible.

Concerning the scope of Accudyne's certification or representation that it complied with the contract provisions the Court also finds that summary judgment is inappropriate for either party. An analysis of this issue must focus on the two applicable provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2) which provide for liability if a person:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the

Government or a member of an armed force a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved;

These two provisions are fundamentally different to the extent which an express false statement must be made to the government. The primary distinction between a claim under section 2 and a claim under section 1 is that section 2 requires an affirmative false statement. To provide any distinct meaning to section 1 it is clear that no such express false statement is required.

Numerous cases support this principle. The Court has previously discussed in some detail the ruling and analysis in *Ab–Tech Construction*, 31 Fed.Cl. 429, wherein the court held that the failure to disclose lack of compliance with certain government requirements had the effect of making a claim for payment a false claim within the meaning of the act. Similarly, the court in *United States v. TDC Management Corp.*, 24 F.3d 292, 296 (D.C.Cir.1994), ruled that liability could attach as a matter of law under the False Claims Act as a result of the failure to disclose material non-compliance. In *TDC*, the contractor held a financial interest in a program that it had contracted to administer, contrary to terms of its agreement with the government. Notwithstanding that as a matter of law the government had accepted TDC's reports as accurate, the court held that an FCA claim continued to exist:

> DOTBCA's determination that [the government] tacitly assented to the activities *contained* in TDC's monthly reports does not collaterally estop the government from bringing a False Claims Act based on information TDC *omitted* from those reports.

*Id.*

Similarly, the contractor in *Imperial Meat v. United States*, 316 F.2d 435 (10th Cir. 1963), was held criminally liable for filing a false claim as a result of providing inferior grade meat to the government notwithstanding that its invoice made no affirmative representation as to the grade of the meat other than by reference to the contract which specified grade. Finally, courts have also held that a person who cashes an erroneously issued government check commits a violation and is liable for making a false claim though no representation of any kind has ever been made to the government to induce it to provide the check. *United States v. McLeod*, 721 F.2d 282, 284 (9th Cir.1983).

All of these cases lead inescapably to the conclusion that a contractor who knowingly fails to perform a material requirement of its contract (or performs no services at all), yet seeks or receives payment as if it had fully performed without disclosing the nonperformance, has presented a false claim to the government and may be liable therefor. Applying this principle to the present facts and viewing those facts and inferences which may be drawn therefrom most favorably to the relators, a claim is stated under § 3729(1). Under such a view the environmental compliance provisions in the contracts were a material part of those contracts and Accudyne knowingly failed to perform that aspect of the contract, yet sought full payment from the government without disclosing failure to perform.

In contrast, viewing the facts most favorably to the defendants, plaintiff is not entitled to summary judgment. The scope and importance of the environmental compliance provisions dispute whether any of those provisions which were breached and the extent to which Accudyne submitted claims for full payment knowing that it had substantially breached these requirements.

To support a claim under § 3729(a)(2) some form of affirmative false statement is required. Because the certifications executed by the defendant are ambiguous summary judgment is inappropriate. Particularly, there is substantial dispute over the scope of the representation made by defendant in the Standard Form 1443 submitted to obtain payment which contains a certification providing in part as follows:

> I certify that the above statement has been prepared from the books and records of the above named contractor in accordance with the contract and instructions herein, and to the best of my knowledge and belief, that it is correct, that all the costs of

contract performance (except herewith reported in writing) have been paid to the extent shown herein, or were not shown as paid have been paid or will be paid currently by the contractor, when due, in the ordinary course of business, that the work reflected above has been performed, that the quantities and amounts involved are consistent with requirements of the contract. . . .

This agreement might reasonably be construed as nothing more than an affirmance that the billing statement is accurate or might be construed to mean that all aspects of the contract relevant to the claim have been fully performed. Under circumstances where the meaning of the language in the certification is ambiguous the issue must be submitted to the jury as an issue of fact. *Agfa–Gevaert, A.G. v. A.B. Dick Co.,* 879 F.2d 1518 (7th Cir.1989). Since the interpretation of this provision may be aided by the use of extrinsic evidence as to the parties' intent, the Court declines to grant summary judgment in favor of either party on the issue of the scope of the certification.

**Lack Of Financial Risk By The Government.**

██ Defendants' final argument in support of their motion for summary judgment on relators' claim II is that no claim is supportable since the United States was not exposed to any financial risk as a result of defendants' alleged failure to comply with the environmental compliance provisions. This argument is without basis in the law. As can be seen by *Ab–Tech* and *TDC* the government routinely insists on contract provisions which do not necessarily implicate direct financial interests of the government. If such provisions are to have effect their knowing violation must have the potential to support FCA claims even though violations do not threaten a financial interest. Accordingly, Courts have consistently held that damage to the financial interests of the government is not a prerequisite to an FCA claim. "A false claim is actionable under the act even though the United States have suffered no measurable damages from the claim." *United States v. Hughes,* 585 F.2d 284, 286 n. 1 (7th Cir. 1978). Defendants motion for summary judgment on this basis must be rejected as a matter of law.

### ORDER

IT IS ORDERED that United States' motion to dismiss defendants' counterclaims and affirmative defenses is DENIED as it concerns defendants' sixth affirmative defense and first, second and third counterclaims except that such claims are limited to a set-off of any amounts recovered by the United States and may not be the basis for any affirmative judgment against the United States.

IT IS FURTHER ORDERED that the United States' motion for summary judgment on defendants' third affirmative defense is GRANTED and that the United States' motion for summary judgment is DENIED in all other respects.

IT IS FURTHER ORDERED that defendants' motion for partial summary judgment on the United States' claims is DENIED.

IT IS FURTHER ORDERED that relators' motion for partial summary judgment on its Claim II is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment on relators' Claim II is DENIED.