AB–TECH CONSTRUCTION,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 298–89 C.

United States Court of Federal Claims.

June 2, 1994.

H.J.A. Alexander, Atlanta, GA, attorney of record for plaintiff.

Harold D. Lester, Jr., with whom were Asst. Atty. Gen. Frank W. Hunger, Director David M. Cohen, Asst. Director Anthony H. Anikeeff, Dept. of Justice, Washington, DC, and Anne W. Westbrook, Dept. of the Army, Corps of Engineers, Savannah, GA, for defendant.

## OPINION

WIESE, Judge.

Ab–Tech Construction, Inc. is a minority-owned small business enterprise that was awarded a subcontract, by the Small Business Administration (SBA), for the construction of an automated data processing facility

for the United States Army Corps of Engineers. In a complaint filed in this court in May of 1989, Ab–Tech claimed entitlement to an increase in contract price because of extra work allegedly caused by defective government specifications.

Proceedings on the claim were halted in May of 1990 when this court granted defendant's motion for a stay of proceedings to await the outcome of a grand jury investigation then inquiring into Ab–Tech's business affairs. This investigation led eventually to a criminal indictment of Elliott Marsh, Ab–Tech's president, on two counts of making false statements to the Government in violation of 18 U.S.C. § 1001.[1] The false statements related to the administration of the contract now in issue. Marsh was tried and convicted. He was sentenced to a term of imprisonment and also was fined $5,000.[2] An appeal was taken. However, it was not successful.[3]

Following conclusion of the criminal proceedings, the Government amended its answer to the complaint filed in this court to assert counterclaims seeking damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3731 (1988 & Supp. IV 1992), and the forfeiture of Ab–Tech's pending claim pursuant to the federal forfeiture statute, 28 U.S.C. § 2514 (1988 & Supp. IV 1992).

Thereafter, the Government moved for summary judgment, arguing that, as a matter of law, Marsh's criminal conviction established the fraud on which the enforceability of its counterclaims depended. Plaintiff, in turn, filed a cross-motion for partial summary judgment contending that even after learning the true facts—meaning the facts initially withheld by Marsh—the Government insisted upon going forward with contract performance. Accordingly, plaintiff maintained that the Government's election to pro-

ceed with the contract in the face of full knowledge of the facts precluded it, as a matter of law, from maintaining any action grounded on allegations of contractor fraud.

The court, after considering the parties' written briefs and the points raised during oral argument, concluded that because of substantial disagreement over material facts, summary judgment was not appropriate. The case was therefore set for trial limited to the central proposition advanced by plaintiff: that by early 1987 both the SBA and the Corps of Engineers had been made fully aware of the terms of a prohibited contract co-management agreement between Ab–Tech and one of its principal subcontractors, Pyramid Construction Company, and that notwithstanding this knowledge, no action was taken by the Government to terminate the contract.

At trial, plaintiff did not prevail. In findings entered at the close of the proceedings, on May 6, 1994, the court ruled that neither of the Government agencies concerned with plaintiff's contract had ever been apprised of the true nature of the working relationship between Ab–Tech and Pyramid. Hence, the court rejected plaintiff's argument that the Government's insistence upon contract performance was synonymous with a waiver of Marsh's earlier misrepresentations. Given these findings and the resulting legal conclusion, disposition of the Government's counterclaims becomes, once again, the matter for decision. We now hold, for reasons set forth herein, that the Government is entitled to prevail on its counterclaims, though not to the full extent demanded.

### Facts

Section 8(a) of the Small Business Act, 15 U.S.C. §§ 631–697c (1988 & Supp. IV 1992), authorizes the SBA to enter into contracts with other Government departments and agencies for the procurement of supplies and

---

**1.** The referenced statute, 18 U.S.C. § 1001 (1988), authorizes imprisonment for not more than five years and/or a fine of not more that $10,000 for any person who "in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representa-

tions, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry."

**2.** *United States v. Marsh*, No. 1:90–CR–240–1 (N.D.Ga. Dec. 20, 1990).

**3.** *United States v. Marsh*, No. 1:90–CR–240–ALL (11th Cir. Dec. 30, 1991).

services with a view to subcontracting the performance of these contracts to small businesses owned and controlled by "socially and economically disadvantaged individuals." [4] The purpose of this so-called 8(a) program is to assist minority-owned enterprises in gaining the managerial skills and business experience necessary to compete in the marketplace.

Business organizations that meet the criteria for participation in the 8(a) program are required, as a final condition of approval, to sign a "Statement of Cooperation" acknowledging their understanding of, and promised compliance with, the program's requirements for continuing eligibility. Current regulations spell out that a basis for termination from the program is the "[f]ailure by the [small business] concern to obtain prior SBA approval of any management agreement, joint venture agreement or other agreement relative to the performance of a section 8(a) subcontract." 13 C.F.R. § 124.209(a)(16) (1993). A statement of cooperation, containing language similar to the quoted text, was initially signed by Elliott Marsh, in behalf of Ab–Tech Construction, Inc. on January 25, 1982.[5] A renewal of that agreement, signed on June 7, 1984, was in place at the time the contract in issue was awarded to plaintiff by the SBA.

The contract in issue was a $1.5 million undertaking involving the construction of an automated data processing building for the United States Army Corps of Engineers at Fort Stewart, Georgia. The award date was July 15, 1985.

During performance of the work, questions arose concerning the relationship between Ab–Tech and one of its principal subcontractors, Pyramid Construction Company—a non-minority owned enterprise. These concerns, raised initially by the Corps of Engineers (the procuring agency and contract administrator), were referred to the SBA for further investigation. Accordingly, on September 10, 1986, Isaiah Washington, an assistant regional director for Minority Small Business and Capital Ownership Development (the SBA office in charge of the 8(a) program) wrote to Elliott Marsh requesting copies of any indemnification agreements between Ab–Tech and Pyramid or any other party and also copies of any subcontracts and/or contract financing agreements between Ab–Tech and any indemnitors. Additionally, Ab–Tech was requested to furnish copies of any agreements with Pyramid or any other party that required contract payments to be deposited into a restricted bank account, i.e., an account whose funds could be withdrawn only upon joint signature.

Ab–Tech responded to this request for information on September 18, 1986, by providing SBA with copies of the contract's payment and performance bonds along with a copy of the company's subcontract with Pyramid. Additionally, in his letter accompanying the transmittal of these documents to SBA, Elliott Marsh denied the existence of any restricted bank account. The letter flatly stated: "There is no 'restricted account.'"

The SBA was not satisfied with the completeness of Ab–Tech's response. In particular, it viewed Ab–Tech's submission of copies of the contract's payment and performance bonds as not responsive to the questions that had been asked concerning the possible existence of indemnification agreements between Ab–Tech and any of its subcontractors. To help clarify the situation, Elliott Marsh was invited to meet with SBA officials for further discussion.

---

4. "Socially disadvantaged individuals" are defined as those individuals "who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5).

"Economically disadvantaged individuals" are defined as those "socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A).

5. The statement of cooperation signed by Elliott Marsh identified among the criteria for termination from the 8(a) program "[h]aving a management agreement or joint venture either written or oral that has not been approved by the [Associate Administrator for Minority Small Business and Capital Ownership Development.]"

A meeting for this purpose took place on November 3, 1986. At this meeting, Elliott Marsh informed SBA personnel that he had obtained the contract's payment and performance bonds without the support of any indemnification agreement from Pyramid. SBA was also told that, except for subcontracting a portion of the construction work to Pyramid, Ab–Tech had made no other financial arrangements with that company.

As matters turned out, neither of Elliott Marsh's statements were truthful. Through an investigation undertaken by the Department of Defense Inspector General, it came to light in 1988 (after the contract had been completed) that, in a document executed on August 1, 1985 (two weeks after contract award), Pyramid had signed an agreement of indemnity in favor of Reliance Insurance Companies—the group of companies that had issued Ab–Tech's payment and performance bonds. This agreement, titled "Continuing Agreement of Indemnity—Contractor's Form," included documentation identifying Pyramid's agreement of indemnity "as a prerequisite to the execution [by Reliance] of the bonds as undertakings for Ab–Tech Construction, Inc." Elliott Marsh was a signatory to this agreement.

More importantly, the Department of Defense investigation also uncovered the existence of a second agreement, executed on August 15, 1985, between Ab–Tech and Pyramid. Though titled simply "Indemnification Agreement," this agreement (i) required Pyramid's approval of all supplier and subcontractor invoices prior to their submission for payment to the Corps of Engineers, (ii) granted Pyramid the right to one half of any additional fees generated through contract change orders, (iii) vested Pyramid with the right to take over full performance of the contract in the event of Ab–Tech's default or failure to abide by the terms of the agreement, (iv) provided for the creation of a separate and special bank account for the deposit of all contract proceeds, and (v) prohibited the withdrawal of any funds from this account "except upon joint signature of . . . Ab–Tech and . . . Pyramid." Thus, the agreement was much more than what its label would suggest. In actuality, the agree-ment granted Pyramid a substantial voice in the management of the contract and coequal authority with Ab–Tech over the receipt and disposition of contracts proceeds. As Isaiah Washington testified at trial, the agreement would not have won SBA's approval had it been submitted to that agency for review prior to execution.

## Discussion

### A. Defendant's First Counterclaim— False Claims Act

In its first counterclaim, the United States seeks to recover statutory penalties and damages under the False Claims Act, 31 U.S.C. §§ 3729–3733 (1988 & Supp. IV 1992) with respect to the claims for payment (*i.e.*, progress payment vouchers) that Ab–Tech submitted to the Corps of Engineers over the course of contract performance. The Government maintains that it is entitled to recover treble damages, *i.e.*, three times the amount that it had paid Ab–Tech over the course of the contract's performance together with a $10,000 penalty for each separate payment demand submitted by Ab–Tech.

The False Claims Act provides, in part, that any person who "(1) knowingly presents . . . to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government" shall be liable to the Government for "a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

■ Do the progress payment vouchers that Ab–Tech submitted to the Government represent false claims within the meaning of this statute? The answer is yes. The False Claims Act reaches beyond demands for money that fraudulently overstate an amount otherwise due; it extends "to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1968).

Seen from this broader perspective, Ab–Tech's claims clearly were fraudulent. The payment vouchers represented an implied certification by Ab–Tech of its continuing adherence to the requirements for participation in the 8(a) program. Therefore, by deliberately withholding from SBA knowledge of the prohibited contract arrangement with Pyramid, Ab–Tech not only dishonored the terms of its agreement with that agency but, more importantly, caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the 8(a) program. In short, the Government was duped by Ab–Tech's active concealment of a fact vital to the integrity of that program. The withholding of such information—information critical to the decision to pay—is the essence of a false claim.[6]

Having decided that the progress payment vouchers are false claims within the meaning of the False Claims Act, the question we come to next is the relief the Government is entitled to receive. To start with, the Government claims that it is entitled to damages equal to three times the amount of progress payments that Ab–Tech received. Under the 21 progress payments that were honored by the Government, a total of $1.4 million was paid to Ab–Tech; thus, the Government now seeks to recoup $4.2 million plus interest.

■ The court cannot go along with this demand. Damages represent compensation for a loss or injury sustained. Here, however, no proof has been offered to show that the Government suffered any detriment to its contract interest because of Ab–Tech's falsehoods. Rather, viewed strictly as a capital investment, the Government got essentially what it paid for—an automated data processing facility built in accordance with the contract drawings and specifications. Thus, the court can discern no basis upon which to uphold the Government's demand for treble damages.[7]

■ The situation is otherwise with regard to the Government's demand for the imposition of statutory penalties. Penalties are authorized by the False Claims Act to address the broad range of ancillary harms—

6. The falsity of Elliott Marsh's statements to the SBA is not open to reexamination here. Section 3731(d) of the False Claims Act precludes a person convicted of having made false statements to the Government from contesting the essential elements of the offense in a subsequent civil proceeding (involving the same transaction) brought under the False Claims Act. The statute reads as follows:

(d) Notwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

7. Although the point is not made entirely clear, defendant's response brief appears to argue that, in addition to treble damages under the False Claims Act, the Government is separately entitled to recover all contract payments made to Ab–Tech—this on the theory that Ab–Tech's criminal conviction rendered the contract void *ab initio*.

The argument is not sound. A contract may be said to be void from the start where there exists a disability of the sort that would preclude the parties' exchange of promises from giving rise to an enforceable engagement. Thus, contracts executed in the absence of contractual authority or in violation of statutory controls placed on the procurement process can be said to be void *ab initio*. *See, e.g., United States v. Acme Process Equip. Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) (contract violated anti-kickback statute); *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (contract violated conflict of interest statute); *Sutton v. United States*, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921) (contract was not enforceable for amount in excess of appropriation).

We do not encounter such legal disabilities here. The subcontract that was awarded to Ab–Tech complied in every respect with applicable statutes and regulations. There was no threshold infirmity. Moreover, that Ab–Tech later executed a prohibited co-management agreement with Pyramid, the existence of which it falsely denied to the SBA, would render Ab–Tech's subcontract voidable (because of the misrepresentation) rather than void. Although voidance of the contract would entitle the Government to a return of contract payments made to Ab–Tech, it would, at the same time, oblige the Government to acknowledge the value of any benefits it had received from the voided contract. Restatement (Second) of Contracts § 376 and comment a (1979). Accordingly, we see no basis for upholding the Government's claimed right to recapture all previously paid contract sums.

harms apart from the fraud itself—that the Government may have suffered because of the deception practiced against it. These penalties are intended not to punish the wrongdoer but rather to compensate the Government for the "costs of corruption." *United States v. Halper,* 490 U.S. 435, 450, 109 S.Ct. 1892, 1903, 104 L.Ed.2d 487 (1989). In this case, such costs would include the added administrative burdens imposed on the Corps of Engineers and the SBA in their respective inquiries into the nature of the business relationship between Ab–Tech and Pyramid; the expense of the criminal investigation undertaken by the Department of Defense Inspector General; the expenses associated with the grand jury's investigation and the ensuing criminal trial; and, most significantly, the societal cost associated with Ab–Tech's abuse of the section 8(a) program.

The costs involved in these activities cannot be precisely quantified. Neither, however, does their allowance require specificity. It is enough that the amount demanded be seen to bear some rational relation to the harm likely to have occurred. *Id.* at 449, 109 S.Ct. at 1902. Here the Government asks for a $10,000 penalty—the maximum allowable amount per claim—for each of the 21 payment vouchers that were submitted by Ab–Tech during the course of contract performance and also for the claim that was later brought in this court. In all, the Government is seeking $220,000 in penalties, an amount that it asserts is fully justified in light of the extensive diversion of resources, both human and capital, that the uncovering of Ab–Tech's fraud occasioned.

We agree with the Government's argument both as to the number of claims for which it seeks the imposition of a penalty as well as to the individual amount of each penalty. As to the first point, the case law is clear that each separate submission seeking payment from the Government is a claim for purposes of the False Claims Act, even when such submissions are made pursuant to one overall contract. *United States v. Killough,* 848 F.2d 1523, 1533 (11th Cir.1988); *United States v. Ehrlich,* 643 F.2d 634, 637 (9th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981). With respect to

the second point, the court is of the view that even if the total amount demanded should exceed the Government's actual out-of-pocket costs, the figure would nevertheless be justified given that the Government is also due compensation for the very real, though largely unquantifiable, injury to the 8(a) program. Thus, we see the total penalty amount as an approximation based on rough justice and, on this ground, deem it allowable. *See Halper,* 490 U.S. at 449, 109 S.Ct. at 1902.

**B. Defendant's Second Counterclaim—Forfeiture Statute**

As its second counterclaim, defendant seeks forfeiture, pursuant to 28 U.S.C. § 2514 (1988 & Supp. IV 1992), of the claim for equitable adjustment presented in the complaint. Defendant is entitled to this relief.

The statute relied on, 28 U.S.C. § 2514, directs the forfeiture of a claim brought against the United States "by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment or allowance thereof." There can be no question that this statute applies here. Ab–Tech's claim for equitable adjustment arises out of the very contract relationship that Elliott Marsh's deceptive dealings with the Government helped falsely to maintain. Ab–Tech's claim is thus rooted in fraud; hence, it may not be allowed to go forward here.

The rule is set out in *Little v. United States,* 138 Ct.Cl. 773, 778, 152 F.Supp. 84, 87–88 (1957):

It is true that the forfeiture statute [28 U.S.C. § 2514] was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government. But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon contract V3020V–241, a contract under which he practiced fraud against the Government, all of his claims

**436**

under that contract will be forfeited pursuant to 28 U.S.C. § 2514.

Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government.

### Conclusion

For the reasons given in this opinion, the Clerk is directed to enter judgment in favor of defendant on its first counterclaim in the amount of $220,000, together with interest as allowed by law and, pursuant to the second counterclaim, to dismiss the complaint with prejudice.