UNITED STATES of America, ex rel. Jay BRYANT, Plaintiffs,

v.

WILLIAMS BUILDING CORPORATION, Defendant.

No. CIV 99–5011.

United States District Court, D. South Dakota, Western Division.

Jan. 29, 2001.

MEMORANDUM OPINION
AND ORDER

BATTEY, District Judge.

## PROCEDURAL HISTORY

[¶ 1] On February 17, 1999, relator Jay Bryant (relator) brought this case under the qui tam provisions of the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, to recover penalties and damages arising from a series of allegedly false claims made by Williams Building Corporation (WBC) for services rendered under a contract between WBC and the United States Air Force.[1]  The United States declined to

---

1. While relator also alleged that he was terminated in violation of the whistleblower provision of the FCA (Count II), this claim was voluntarily dismissed on October 5, 2000. *See* Docket # 53.

intervene and relator elected to pursue this case on behalf of the United States pursuant to § 3730(b)(4)(B). Currently before the Court is WBC's motion for summary judgment. In addition to relator's response, the Court is also in receipt of the United States' amicus curiae brief presented in response to WBC's motion for summary judgment. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### FACTS

[¶ 2] The following is a summary of the relevant undisputed facts. Relator was employed by defendant WBC for a period of time beginning in March 1998, and ending with his termination on October 6, 1998. See Defendant's Statement of Material Facts (DSMF) at ¶ 1; Plaintiff's Statement of Material Facts (PSMF) at ¶ 1. During all times at issue in this case, WBC had a contract with the United States Air Force (Air Force) to remodel bathrooms in the occupied family housing units at Ellsworth Air Force Base, South Dakota. See DSMF at ¶ 2; PSMF at ¶ 2. The contract contained the following clause:

> Section 02070, Part 1.7(B). Asbestos. It is not expected that asbestos will be encountered in the work. If any materials suspected of containing asbestos are encountered, do not disturb the materials. Immediately notify the contracting officer.

Defendant's Brief in Support of Summary Judgment (Defendant's Brief in Support) at 2 (Ellsworth contract). Sometime in June 1998, a fellow employee informed relator that he had found asbestos when cutting through the bottom of the bathroom walls to make a plumbing chase. See DSMF at ¶ 4; PSMF at ¶ 4; Deposition of William Tilton (Tilton Depo.) at 26. Relator claims that during the second week of July, 1998, he advised the project superintendent, William Tilton (Tilton), of the presence of asbestos. See DSMF at ¶¶ 6–7; PSMF at ¶¶ 6–7. Despite the dis-

covery of asbestos, work on the project continued and the Air Force was not notified. See Tilton Depo. at 28–29.

[¶ 3] On October 6, 1998, relator was fired for using drugs on the job site. DSMF at ¶¶ 23–26; PSMF at ¶¶ 23–26. On this same day, relator contacted L & L Insulation (L & L) to ask about the dangers of asbestos. See DSMF at ¶ 20; PSMF at ¶ 20. While speaking with L & L, relator did not identify himself, though he admitted that he had encountered asbestos while working on a remodeling project at Ellsworth, and that he had been instructed to cut the asbestos and push it down between the walls. See Plaintiff's Brief in Opposition to Summary Judgment (Plaintiff's Opposition Brief), Attached Affidavit of Dave Goodsell at ¶ 3.

[¶ 4] Shortly after this conversation, a representative of L & L contacted the Asbestos Program Manager at Ellsworth, Dave Goodsell (Goodsell), to inform him of the phone call. See *id.* at ¶¶ 2–3. Goodsell immediately notified Government Inspector Bill Cudmore (Cudmore), and they agreed to visit the job site and inspect a bathroom unit currently under renovation. See *id.* at ¶¶ 4–6. During the inspection, Goodsell and Cudmore approached site superintendent Tilton and asked whether he had encountered asbestos on the project. See *id.* at ¶ 6. Tilton said he had not. See *id.* After examining the site, neither Goodsell nor Cudmore where able to find any signs of asbestos. See *id.* at ¶ 8. Before leaving the site, Goodsell asked the two laborers doing the demolition work on the bathroom if they had encountered asbestos, and they indicated they had not. See *id.* at ¶ 7.

[¶ 5] On November 27, 1998, Tilton changed the way he did the cutting for the plumbing chase, in order to avoid cutting through asbestos. See Tilton Depo. at 36. By this point, transite tiles containing as-

bestos had been cut and disturbed in at least 60 of the family housing units at Ellsworth. On February 16, 1999, relator filed the instant action which resulted in the Air Force finally being notified of the presence of asbestos—almost one year from the date the project began.

[¶ 6] Throughout the pendency of the project, superintendent Tilton submitted Construction Quality Control Daily Reports (daily reports) both to the corporate offices of WBC and to the government. See Affidavit of Tim Williams (Williams Aff.) at ¶¶ 1–2. Under the terms of WBC's contract, the submission of daily reports to the government was not mandatory. See *id.* The daily reports identified the location and description of work performed each day, reported verbal instructions received from government personnel, noted whether work was performed by subcontractors, identified safety violations, and listed the results of government inspections. See *id.* at ¶ 1. Each daily report also contained the following language above the signature line:

> CERTIFICATION: I certify that this report is complete and correct and that I, or my authorized representative, have inspected all work performed this day by Williams Building Corporation and each sub-contractor and have determined that all materials, equipment, and workmanship are in strict compliance with the plans and specifications, except as may be noted herein.

Williams Aff., Exhibit A.

[¶ 7] In addition to submitting daily reports, Tilton also verbally requested that Cudmore inspect each unit as it was completed. See Tilton Depo. at 48–49. The purpose of a unit-by-unit inspection process was to permit WBC to move onto another unit, once the previous unit had been accepted. See *id.* at 49. In making the inspection request, Tilton admits that he was essentially saying that the bathroom was completed according to specifications. See *id.*

[¶ 8] Also submitted throughout the project were a series of Contract Progress Reports (progress reports) signed by the president of WBC, Tim Williams. See Williams Aff. at 5. Each progress report stated: "I hereby certify that the contractor has satisfactorily completed the indicated percentage of the contract per contract specifications." Williams Aff., Exhibit C. There appears to be no dispute that WBC technically performed all of the work described in each progress report.

[¶ 9] Finally, during the course of performing under the contract, WBC presented the government with several Request for Payment Invoices (payment invoices). See Williams Aff. at 5. It was through submission of these invoices that WBC received payment from the government. Again, there is no dispute that WBC technically performed all of the work described in these documents.

## SUMMARY JUDGMENT STANDARD

[¶ 10] Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, the

nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.

[¶ 11] In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The Supreme Court has instructed that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 106 S.Ct. at 1356.

[¶ 12] The teaching of *Matsushita* was further articulated by the Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) where the Court said, "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." The Court expounded on this notion by reiterating its conclusion in *Anderson* that, "[s]ummary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Eastman Kodak*, 504 U.S. at 468 n. 14, 112 S.Ct. at 2083 n. 14 (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at

2510). To survive summary judgment there must be evidence that "reasonably tends to prove" the plaintiff's theory; the defendant meets the burden under Fed. R.Civ.P. 56(c) when it is conclusively shown that the facts upon which the nonmoving party relied to support the allegations were not susceptible of the interpretation which was sought to give them; only reasonable inferences can be drawn from the evidence in favor of the nonmoving party. *Id.* (citations omitted).

## DISCUSSION

[¶ 13] After conducting an exhaustive review of the pleadings, briefs, and documents presented in this case, and upon viewing the record in the light most favorable to the nonmoving party, the Court concludes relator has presented sufficient evidence from which a reasonable jury could return a verdict on his behalf under § 3729(a)(1) and/or § 3729(a)(2) and § 3729(a)(7) of the Act. Accordingly, as to these claims, WBC's motion for summary judgment shall be denied. *See Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997) ("[s]ummary judgment is appropriate if the plaintiff lacks sufficient evidence to show that any false or fraudulent claims have been made.") (citing *Wang v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir.1992)).

[¶ 14] In enacting the FCA, Congress sought to protect government funds and property from fraudulent claims. *See Costner v. URS Consultants, Inc.*, 153 F.3d 667, 676 (8th Cir.1998) (citing *Rainwater v. United States*, 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958)). The Act imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States ... a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be

made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." § 3729(a)(1)-(2). In addition, the FCA imposes liability on any person who uses a false statement "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." § 3729(a)(7) (often referred to as a "reverse false claim"). In addressing the scope of the FCA, the United States Supreme Court has observed that "the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."[2] *United States v. Neifert–White Co.,* 390 U.S. 228, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968); *see also Rainwater,* 78 S.Ct. at 946 ("It seems quite clear that the objective of Congress [in the FCA] was broadly to protect the funds and property of the Government from fraudulent claims.")

[¶ 15] In this case, relator alleges that WBC's submission of daily reports, progress reports, and payment invoices, as well as Tilton's verbal inspection requests, constituted false claims in violation of the FCA. *See* § 3729(a)(1)-(2). Relator also alleges that WBC violated the "reverse false claim" provision of the Act. *See* § 3729(a)(7). In requesting summary judgment, WBC argues that (1) Tilton's actions may not be imputed to WBC; (2) the documents submitted on behalf of WBC, as well as Tilton's verbal requests, stated only the truth, and therefore cannot be considered "false claims"; and (3) WBC did not owe an obligation to the government in the form of a debt that was sufficiently concrete to give rise to a reverse false claim. The Court addresses each of these issues seriatim.

[¶ 16] **Vicarious Liability**

[¶ 17] WBC contends that Tilton's actions in allegedly concealing, failing to report, and/or disturbing the asbestos cannot be imputed to WBC. The crux of WBC's argument rests on two recent United States Supreme Court cases. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), the Court observed that the current version of the FCA, which now provides for treble damages, is "essentially punitive in nature," *see* 120 S.Ct. at 1869, while in *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Court held that an employer must be culpable to some degree in order to have the employee's knowledge and acts imputed to it for punitive damages liability under Title VII. *See* 119 S.Ct. at 2129. According to WBC, the holding of *Kolstad* (when viewed in conjunction with *Vermont Agency*) serves to limit the vicarious liability of employers not just under Title VII, but under the FCA as well. Thus, WBC argues, with no evidence in the record showing its president, Tim Williams, nor any other executive, knew that Tilton had found and disturbed asbestos during the Ellsworth project, WBC cannot be said to have exhibited the type of culpable conduct required by *Kolstad.* WBC goes on to insist that in the absence of such "culpable conduct," it may not be held vicariously liable for the allegedly unlawful acts of its agent, Tilton. The Court is unpersuaded by this argument.

[¶ 18] While there is no doubt that the Supreme Court intended in *Vermont Agency* to define the FCA as "essentially punitive in nature," the applicability of the *Kolstad* decision to the FCA is less clear. Accordingly, a somewhat detailed discus-

---

**2.** The FCA was originally enacted in 1863 with the principal goal of stopping the massive frauds perpetrated by large contractors during the Civil War. *See United States v. Bornstein,* 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

sion of the reasoning behind the *Kolstad* decision is required.

[¶ 19] In 1991, Congress provided additional remedies, including punitive damages, for Title VII violations. *See Kolstad,* 119 S.Ct. at 2124. The availability of punitive damages, however, was confined to those discrimination cases where the plaintiff was able to demonstrate "that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad,* the Supreme Court observed that the terms "malice" and "reckless indifference," as used in § 1981a(b)(1), pertain not to the employer's knowledge that it may be engaging in discrimination, but rather to the employer's knowledge that it may be acting in violation of federal law. *See id.*

[¶ 20] With this clarification in mind, the *Kolstad* Court went on to set forth a new standard for imputing vicarious liability to employers. *See id.* at 2128. Here, the Court looked to the Restatement (Second) of Agency § 217C, which strictly limits the circumstances under which an agent's misconduct may be imputed to the principal for the purposes of awarding punitive damages. Under § 217C punitive damages may be imputed to an employer if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act. *Id.* (quoting Restatement (Second) of Agency § 217C).

[¶ 21] After listing each of these elements, the majority devoted the remainder of its discussion to the applicability of the scope of employment doctrine, found in subsection (c), to a Title VII plaintiff's ability to impute punitive damages to an employer based upon the wrongful actions of its employee. *See id.* at 2128–29. The Court remarked that under standard scope of employment principles, those employers who make efforts to educate themselves and their employees on Title VII's prohibitions (for instance through drafting a sexual harassment policy or by giving sexual harassment educational workshops) would be more likely to be exposed to punitive damages upon a violation of the act, because these actions could be used as evidence of the employer's "knowledge" that it was acting in violation of Title VII. *See id.* at 2129. While in contrast, an employer that does nothing to educate its employees or to prevent sexual harassment would be less susceptible to punitive damages because such inaction would make it considerably more difficult for a plaintiff to show that the employer knew it was acting in violation of Title VII.

[¶ 22] Since Title VII's primary of objective is to "motivat[e] employers to detect and deter Title VII violations," *Kolstad,* 119 S.Ct. at 2129, the Court adopted a new rule for holding employers vicariously liable in punitive damages: "In light of the perverse incentives that the Restatement's 'scope of employment' rules create, we are compelled to modify these principles to avoid undermining the objectives underlying Title VII." *Id.* at 2129. Thus, the Court went on to hold:

> Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, we agree that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial

agents where these decisions are contrary to the employer's "good-faith efforts to comply with Title VII."

*Id.* (quoting *Kolstad v. American Dental Ass'n,* 139 F.3d 958, 974 (Tatel, J., dissenting)). The goals behind Title VII, however, are very different than the objectives of the FCA, which seeks to encourage private citizen involvement in exposing those types of fraud that might result in financial loss to the government, thereby ensuring the recoupment of such losses. *See Neifert–White Co.,* 88 S.Ct. at 961; *see also* H.R.Rep. No. 99–660, p. 18 (1996); *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 551–52, 63 S.Ct. 379, 387–88, 87 L.Ed. 443 (1943) (recognizing that purpose of False Claims Act is to make the government completely whole).

■ [¶ 23] Because the Supreme Court's modification of the scope of employment rule was compelled by concerns unique to Title VII, this Court is not convinced that the *Kolstad* decision has any bearing upon the application of agency principles in the context of the FCA. Accordingly, the Court rejects WBC's invitation to extend the holding of *Kolstad* to the FCA.

[¶ 24] In view of this conclusion, the Court is guided by the majority of cases which hold a principal liable whenever its agent acts within the scope of employment or with apparent authority, regardless of the principal's knowledge, culpability, policies, or efforts to restrain the employee's bad acts. *See, e.g., American Society of Mechanical Engrs., Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (*ASME* ) (concluding under treble damage provision of antitrust statute that an employee's wrongful acts would be imputed to the employer even though the employer did not know of or ratify the misdeeds, based on the employee's apparent authority to bind the employer); *United States v. O'Connell,* 890 F.2d 563, 568–69 (1st Cir.1989) (holding that a corpora-

tion should be held liable under FCA for fraud of an agent who acts with apparent authority even if corporation received no benefit from agent's fraud); *United States v. Hangar One, Inc.,* 563 F.2d 1155, 1158 (5th Cir.1977) (upholding vicarious liability under the FCA when low-level employee acted within the scope of employment and for the purpose of benefitting the employer); *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 437 (E.D.N.Y.1995) (holding vicarious liability attaches if employee acted either within the scope of employment and to at least partially benefit the employer, or with apparent authority, even if the acts do not benefit the employer at all); *see also Grand Union Co. v. United States,* 696 F.2d 888, 890–91 (11th Cir.1983) (holding that knowledge would only be imputed to employer if employee acted within scope of employment and with purpose of benefitting employer).

[¶ 25] The rationale behind this rule is premised upon the reality that it is the agent's position which facilitates the consummation of the fraud, because from the point of view of a third party, the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him. *See ASME,* 102 S.Ct. at 1942 (quoting Restatement (Second) of Agency § 261 cmt. a (1957)). This is certainly the rule in this case, as it is undisputed that Tilton worked as WBC's main superintendent on the Ellsworth project. It was Tilton who sought verbal approval of each bathroom as it was completed, submitted daily reports, supervised the onsite employees, and served as the liaison between WBC and government inspector Cudmore. Moreover, it is Tilton who is alleged to have instructed the WBC employees doing the demolition on the bathrooms to ignore the asbestos and to cut through the transite tiles containing asbestos. According-

ly, this Court concludes as a matter of law that the actions of Tilton may indeed be imputed to WBC.

### [¶ 26] Alleged False Claims

[¶ 27] Relator alleges that WBC presented false claims by submitting daily reports, progress reports, and payment invoices to the government. In addition, relator contends that Tilton's oral requests for inspection also should be considered false claims. Upon giving all favorable inferences to relator as the nonmoving party, this Court concludes that a reasonable jury could find in relator's favor on these claims.

[¶ 28] As this Court has already observed, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States ... a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." § 3729(a)(1)-(2). The Act defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient." § 3729(c). Despite the specificity of this language, the Supreme Court has observed that the FCA "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *Neifert–White Co.,* 88 S.Ct. at 961 (quoted in *Costner,* 153 F.3d at 677). The FCA's legislative history confirms such an expansive application of the FCA: "Each and every claim submitted under a contract ... which was originally obtained by means of false statements *or other corrupt or fraudulent conduct,* or in violation of any statute or applicable regulation, constitutes a false claim." S.Rep. No. 345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (emphasis added).

[¶ 29] Turning first to WBC's submission of the daily reports and progress reports, when Tilton submitted daily reports to the government, the reports certified that he had inspected all of the work and determined that "all materials, equipment, and workmanship are in strict compliance with the plans and specifications, except as may be noted herein." Similarly, WBC's submission of the progress reports also contained language of certification: "I hereby certify that the contractor has satisfactorily completed the indicated percentage of the contract per contract specifications." WBC now urges that neither of these submissions contained false statements within the meaning of the FCA, pointing to the fact that they do not contain specific reference to the contract clause relating to asbestos.

[¶ 30] Since the facts currently in the record, viewed most favorably to the relator, support a finding that the submission of both the daily reports and the progress reports were expressly false, *see* § 3729(a)(1)-(2), summary judgment cannot be granted in WBC's favor. Both of these reports contained the express certification that WBC had strictly complied with the plans and specification of the contract, despite WBC's knowledge at the time of submission that it had not only discovered asbestos in the Ellsworth units and thereafter failed to advise the government of the discovery, but additionally, that it had disturbed asbestos (and potentially contaminated) these very same units. In short, a reasonable jury could find that the submission of the reports attesting to WBC's strict compliance with the contract specifications was patently false and therefore in violation of the FCA.

[¶ 31] Furthermore, even if these reports are not found to be expressly false when viewed by themselves, a reasonable jury could find that the reports were impli-

edly false. Under the theory of implied certification, FCA liability may arise even absent an affirmative or express false statement, where submission of such documents represents an implied certification by a contractor of its continuing adherence to all material portions of the contract. *See United States ex rel. Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519 (10th Cir.2000) (holding that a false implied certification of compliance with a government contract may constitute a false claim upon which an FCA action may be based); *Pickens v. Kanawha River Towing*, 916 F.Supp. 702 (S.D.Ohio 1996) ("[A] contractor who knowing fails to perform a material requirement of it contract . . . yet seeks or receives payment as if it fully performed without disclosing the nonperformance, has presented a false claim to the government and maybe liable therefor."); *Ab–Tech Construction v. United States*, 31 Fed. Cl. 429 (1994) (holding that payment vouchers were implied certification of continued adherence to program's requirements, causing government to pay funds in mistaken belief it was furthering program goals); S.Rep. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274 (commenting that a false claim "may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms. . . .") In this case a reasonable jury may find that the submission of the daily reports and/or the progress reports were indeed impliedly false or fraudulently submitted for approval.

[¶ 32] For the very same reasons outlined above, this Court must also conclude (having given all favorable inferences to the nonmoving party) that a reasonable jury could find that WBC submitted false claims when presenting its payment invoices to the government for reimbursement. These payment invoices represented an implied certification by WBC of its continuing adherence to all material terms of the contract. *See Shaw*, 213 F.3d at 531–32; *Ab–Tech*, 31 Fed. Cl. at 434. Thus, WBC's submission of these invoices, while in material breach of the contract, also may be found to have violated the FCA. *See id.*

[¶ 33] As a final matter, the Court would note that the application of the implied certification theory seems particularly appropriate in this case where WBC's discovery and disturbance of the asbestos was not readily apparent upon government inspection. In view of this concern, the government included a clause in the contract advising WBC that if it did encounter materials suspected of containing asbestos, it should avoid disturbing the materials and immediately notify the contracting officer. Here, WBC submitted both the reports and the payment invoices repeatedly implying that all was well with the project, though it had encountered and disturbed asbestos in each of the units. Withholding such critical information, while simultaneously seeking payment under the contract, appears to this Court to be the very essence of a false claim. *See United States ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 621–22.

■ [¶ 34] With the foregoing discussion in mind, the Court now turns to the verbal inspection requests made by Tilton to government inspector Cudmore. Relator alleges that each time Tilton approached Cudmore to have a bathroom inspected, he was essentially saying that the bathroom had been completed according to the contract specifications and therefore these verbal requests, like the daily reports, also constitute false claims. In support of this allegation, relator points to Tilton's deposition in which the following exchange occurred:

Q:  My understanding is that when you would complete a unit . . . you, as the superintendent, would go to Bill

Cudmore ... and say, I have a unit that's been completed?

A: Yeah.

Q: And then Mr. Cudmore would come over immediately or as soon as possible to conduct an inspection?

A: That's correct.

Q: If Mr. Cudmore approved the inspection, then you could open up another unit and ... begin renovation?

A: If it was a full bathroom he was inspecting, yes....

Q: When you contacted Mr. Cudmore and would say, I have a bathroom that's ready for inspection, you were basically saying that the bathroom was completed according to the specifications?

A: Yes.

Q: And the reason you were doing that was to move on to another unit and to eventually get paid for your work on the project?

A: Yeah, I suppose that is the goal.

Tilton Depo. at 48–49. To avoid entry of an adverse judgment, it is incumbent upon the party opposing summary judgment to support its case with more than a scintilla of evidence. *See Dush v. Appleton Elec. Co.*, 124 F.3d 957, 963 (8th Cir.1997) (citing *F.D.I.C. v. Bell,* 106 F.3d 258, 263 (8th Cir.1997)). Here, relator argues that Tilton's oral requests for inspection constituted false claims under the Act because he was impliedly certifying that each bathroom was in full compliance with the specifications of the contract. Tilton's verbal requests, without more, may ultimately fail to establish false claims. Relator has presented more than a scintilla of evidence in support of this allegation. Therefore, WBC's motion for summary judgment as to this claim will be denied.

[¶ 35] **Reverse False Claim**

[¶ 36] In 1986, Congress amended the FCA to include a provision extending the Act to cover what has become known as "reverse false claims." Section 3729(a)(7) provides for a civil penalty and treble damages for using a false statement "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government ." Essentially, this provision gives the government a means to recover from someone who makes a material misrepresentation to avoid paying an obligation owed to the government. *See* S.Rep. No. 99–345, at 18, *reprinted in* 1986 U.S.C.C.A.N. at 5283. In discussing what type of "obligation" may give rise to a reverse false claim, the Eighth Circuit cautioned:

> To recover under the False Claims Act, we believe that the [government] must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. The obligation cannot be merely a potential liability: instead ... *a defendant must have had a present duty to pay money or property* that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness.

*United States v. Q International Courier, Inc.,* 131 F.3d 770, 773 (8th Cir.1997) (emphasis added).

[¶ 37] In this case, relator argues that WBC's owed an obligation to the government to inform the government that suspected asbestos-containing material had been discovered and disturbed and therefore asbestos testing and abatement would need to occur. By reason of this fact sensitive issue, summary judgment is denied.

## CONCLUSION

[¶ 38] Based upon this Court's review of the pleadings, depositions, affidavits, and exhibits presented by the parties in this

case, the Court concludes as a matter of law that the actions of WBC's site superintendent, Tilton, may be imputed to WBC. Furthermore, after giving all favorable inferences to relator as the nonmoving party, the Court believes that a reasonable jury could find in his favor on the allegations that WBC submitted false claims to the United States government during the course of its work on the Ellsworth remodeling project. The Court further concludes that relator has presented sufficient evidence from which a jury could find that WBC made a material misrepresentation to the government in the form of a reverse false claim. Based upon the foregoing discussion, it is hereby

[¶ 39] ORDERED that Williams Building Corporation's motion for summary judgment (Docket # 39) is denied.